IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION


JODI CLINE,                            )    CASE NO.  1:18-cv-01566
                                       )
              Plaintiff,               )    MAGISTRATE JUDGE
                                       )    KATHLEEN B. BURKE
         v.                            )
                                       )
COMMISSIONER OF SOCIAL                 )
SECURITY,                              )
                                       )    **<u>MEMORANDUM OPINION & ORDER</u>**
              Defendant.               )


Plaintiff Jodi Cline ("Plaintiff" or "Cline") seeks judicial review of the final decision of

Defendant Commissioner of Social Security ("Defendant" or "Commissioner") denying her

applications for social security disability benefits.  Doc. 3.  This Court has jurisdiction pursuant

to 42 U.S.C. § 405(g).  This case is before the undersigned Magistrate Judge pursuant to the

consent of the parties. Doc. 13.

For the reasons explained herein, the Court finds that that the Administrative Law Judge

("ALJ") either overlooked, inaccurately read, and/or made misstatements regarding medical

evidence.  Therefore, the Court is unable to conduct a meaningful review to assess whether the

ALJ's decision to assign little weight to the opinion of Cline's treating neurologist Dr. Baddour

and/or the RFC assessment are supported by substantial evidence.  Accordingly, the Court

REVERSES and REMANDS the Commissioner's decision for further proceedings consistent with this opinion.

## I. Procedural History

On March 17, 2015, Cline protectively filed applications for disability insurance benefits ("DIB") and supplemental security income ("SSI").[1]  Tr. 15, 69, 105, 133, 134, 229-235.  Cline alleged a disability onset date of November 21, 2014.  Tr. 15, 69, 86, 229, 290.   She alleged disability due to brain cyst, fibromyalgia, feet pain with swelling, migraines, back pain, being tested for multiple sclerosis, balance issues, problem with choking, bladder won't empty all the way, trigeminal neuralgia, standing limitations of 20-30 minutes, walking limitations of 15-20 minutes, sitting limitations of 1-2 hours, lifting limitations of 8-10 pounds, grip issues in both hands, cannot open two liter of pop, shortness of breath, sleeping problems with chronic fatigue, tingling in arms and fingers, acid reflux/ulcers, restless leg syndrome, depression, crying spells 6-7 times per day, foggy thinking, general anxiety, and social anxiety.  Tr. 69, 105, 136.

After initial denial by the state agency (Tr. 135-142) and denial upon reconsideration (Tr. 145-149), Cline requested a hearing (Tr. 151-152).  A hearing was held before the ALJ on June 30, 2017.  Tr. 36-68.  On December 4, 2017, the ALJ issued an unfavorable decision (Tr. 12-35), finding that Cline had not been under a disability, as defined in the Social Security Act, from November 21, 2014, through the date of the decision (Tr. 28).  Cline requested review of the ALJ's decision by the Appeals Council.  Tr. 219-223, 336-340.  On May 31, 2018, the Appeals Council denied Cline's request for review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-6.

---

[1] The Social Security Administration explains that "protective filing date" is "The date you first contact us about filing for benefits. It may be used to establish an earlier application date than when we receive your signed application."  http://www.socialsecurity.gov/agency/glossary/ (last visited 7/31/2019).

**II. Evidence**

**A.     Personal, vocational and educational evidence**

Cline was born in 1971.  Tr. 229.  She has three children – 2 adults and one minor.  Tr. 41, 1530.  Cline completed high school and two years of college.  Tr. 41.  She was unable to finish her nursing degree.  Tr. 41.  She worked in the past as a home health aide.  Tr. 42.  Cline estimated having last worked in 2014.  Tr. 42.

**B.     Medical evidence**

**1.     Treatment history**

In 1994, Cline had brain surgery for a left-sided arachnoid cyst.  Tr. 510.  As far back as 2007, and continuing until 2014, Cline complained of headaches.  Tr. 509, 511, 957.  She first consulted with neurologist Dr. Raymond Baddour, M.D., in 2007 for evaluation of her headaches.  Tr. 883.  On April 9, 2014, Cline sought emergency room treatment at The Ohio State University Wexner Medical Center for jaw pain and a headache.  Tr. 957.  Cline reported having seen both her dentist and her primary care physician for her left-sided jaw pain, which had started the prior December but had waxed and waned.  Tr. 957.  She had been diagnosed with TMJ.  Tr. 957.  The emergency room physician noted that Cline was scheduled to see Dr. Gregory Ness, DDS, on April 16, 2014, and did not feel that there was anything that could be done at the emergency room to help Cline with her problems.  Tr. 959, 1149.  When Cline saw Dr. Ness on April 16, 2014, he suspected neuropathic pain consistent with trigeminal neuralgia and recommended that Cline follow up with her neurologist.  Tr. 1150-1153.

Upon an order from Dr. Baddour, on June 3, 2014, Cline had a brain MRI due to severe left jaw and facial pain with headaches.  Tr. 506-507.  The MRI showed a benign vascular

3

malformation consistent with venous hemangioma involving the left cerebellum hemisphere; status post previous left parietal craniotomy with a focal area of encephalomalacia or cortical atrophy deep to the craniotomy site and no enhancement present at the surgical site; and no focal signal abnormality or abnormal enhancement observed along the course of the trigeminal nerve. Tr. 507.

On June 10, 2014, Cline sought emergency room treatment at Shelby Hospital for the pain to the left side of her face, cheek and jaw. Tr. 921. She explained that Dr. Ness at OSU had diagnosed her with trigeminal neuralgia, and she had been taking baclofen but she was no longer getting any relief. Tr. 921. She reported having an appointment scheduled with an oral surgeon at OSU but could not get in sooner. Tr. 921. Cline's diagnosis was facial pain and she was discharged home in stable condition. Tr. 923. Cline returned to the emergency room on June 15, 2014, complaining "I'm sick all over." Tr. 917. Her symptoms included nausea and vomiting. Tr. 917. She had not taken Percocet or Vicodin for three days. Tr. 917. Cline was not interested in any more pain pills so the emergency course of treatment was to help Cline with her withdrawal symptoms. Tr. 920. She was discharged home in stable condition. Tr. 920.

Cline saw Dr. Daniel M. Prevedello, M.D., at The James Skull Base Surgery Clinic on July 15, 2014, for a consultation regarding her left-sided facial pain. Tr. 537. Cline noted that her headaches may be related to her history of left frontal arachnoid cyst that had been operated on. Tr. 537. Dr. Prevedello's physical examination showed normal range of motion, no edema, normal strength and reflexes, no cranial nerve deficit, normal muscle tone, and normal gait and coordination. Tr. 540. Dr. Prevedello noted Cline had no pain when he touched her face on the left side. Tr. 540. Cline explained that her face usually gets irritated by touching but she had taken a Percocet earlier in the day. Tr. 540. Dr. Prevedello recommended additional diagnostic

testing to better evaluate the relationship of the trigeminal nerves with the vascularity at the posterior fossa. Tr. 540. Dr. Prevedello explained to Cline that her cyst was not the cause of her facial pain. Tr. 540-541. He felt that Cline's pain was slightly atypical and recommended that she return in one week. Tr. 541.

Cline had the additional testing recommended by Dr. Prevedello completed on July 22, 2014. Tr. 549-553. Cline then followed up with Dr. Prevedello on July 22, 2014.[2] Tr. 560-567. Dr. Prevedello indicated that the MRI sequence showed an ectatic vessel which might explain her facial pain. Tr. 567. Dr. Prevedello also indicated that Cline had initially done very well with Tegretol but she developed a rash and had to switch to Dilantin which was not controlling her pain as well. Tr. 567. Dr. Prevedello felt that surgery could benefit Cline but both he and Cline felt that they should exhaust medical therapy as a means of managing her condition. Tr. 567. Thus, Dr. Prevedello recommended that Cline taper off of Dilantin (under the guidance of her neurologist) and try a different class of antiepileptic medication, like Gabapentin, before considering surgery. Tr. 567. Dr. Prevedello indicated he would see Cline for follow up in three months, noting that Cline should call sooner if her pain became too unbearable. Tr. 567.

Cline saw Dr. Baddour on August 12, 2014. Tr. 846. During that visit, Dr. Baddour noted diagnoses of fibromyalgia, tension-vascular headaches, restless leg syndrome, and trigeminal neuralgia. Tr. 846. On physical examination, Dr. Baddour noted no deficits to pinprick over the face. Tr. 846. Dr. Baddour advised Cline to start to taper Dilantin and start on Gabapentin for trigeminal neuralgia. Tr. 846. He also continued Percocet to be taken as needed as well as Maxalt for headaches, Zofran for nausea, and Requip for restless leg syndrome. Tr. 846.

---

[2] Dr. Prevedello interviewed and examined Cline along with Dr. Edward E. Kerr, M.D., a fellow. Tr. 567.

On October 16, 2014, Cline saw Dr. Robert Secor, M.D., her primary care physician, for an office visit.  Tr. 618, 1226-1227.  Dr. Secor noted present illnesses of allergies, trigeminal neuralgia, and fibromyalgia.  Tr. 1226-1227.  Other than an abnormal heart sound being noted, physical examination findings were normal.  Tr. 1227.  Prescriptions for Neurontin and Percocet were provided.  Tr. 1227.

During a November 11, 2014, visit, Dr. Baddour noted that Cline's tension-vascular headaches and her right occipital neuralgia had subsided.  Tr. 844.  Physical examination findings were unremarkable.  Tr. 844.  Dr. Baddour noted that Gabapentin was helping but was concerned that it could be causing some lower extremity swelling so adjustments were made to Cline's medication.  Tr. 844.  Also, Cline planned on getting compression stockings for her lower extremity swelling.  Tr. 844.

Cline saw Dr. Prevedello on November 25, 2014.  Tr. 574-579.  Dr. Prevedello's physical examination showed normal range of motion, no edema, normal strength and reflexes, no cranial nerve deficit, normal muscle tone, and normal gait and coordination.  Tr. 578.  He noted that Cline's left-sided facial pain was exacerbated by brushing of her teeth.  Tr. 578.  Dr. Prevedello recommended trigeminal nerve decompression surgery and planned to proceed with the surgery in January.  Tr. 578-579.

On January 9, 2015, Cline underwent microvascular decompression of the left trigeminal nerve, which was performed by Dr. Prevedello.  Tr. 612-618.  She was discharged home with instructions to have her staples/sutures removed within 10-14 days.  Tr. 618.  On January 21, 2015, Cline saw Dr. Secor for a post-operative visit and removal of her sutures.  Tr. 1228-1230.  Cline returned to see Dr. Prevedello on February 10, 2015, for a post-operative visit.  Tr. 1023-1209.  Cline was doing well one-month post-op.  Tr. 1028.  She felt her left V2 distribution pain

was improved but not entirely resolved. Tr. 1028. Thus, Dr. Prevedello recommended that Cline continue taking her Neurontin and then consider tapering off if possible after two more months. Tr. 1028. She was still reporting daily headaches. Tr. 1028. Dr. Prevedello planned to compare old imaging with new imaging to see if Cline's arachnoid cyst was growing. Tr. 1028.

When Cline saw Dr. Baddour on March 24, 2105, she relayed that she had not recently had any significant headaches. Tr. 840. A six-day Prednisone taper in combination with other medications had helped her headaches. Tr. 840. Also, a prior right occipital injection had been of benefit in reducing her headaches for about two days. Tr. 840. The surgery in January had helped reduce Cline's trigeminal neuralgia pain but she was still experiencing trigeminal neuralgia pain daily. Tr. 840. Cline complained of restless leg syndrome and musculoskeletal low back pain. Tr. 840. On physical examination, Dr. Baddour observed 5/5 motor strength in foot dorsiflexors bilaterally and quadriceps bilaterally, deep tendon reflexes absent in the right ankle otherwise +1 in the lower extremities, plantar responses were downward bilaterally, negative straight leg raise bilaterally, no edema in lower extremities, and upper lumbar paraspinal muscle tenderness. Tr. 840. For her restless leg syndrome and back pain, Dr. Baddour recommended a six-day Prednisone taper and possibly a lumbar MRI if her back symptoms persisted. Tr. 840-841.

Cline followed up with Dr. Prevedello on April 14, 2015. Tr. 1029-1034. On physical examination, Dr. Prevedello observed grossly normal range of motion, no dependent edema in arms/legs, normal mood and affect, motor strength was 5/5, sensation intact in bilateral C2-T2 and L2-S2, and reflexes were present and equal (+1). Tr. 1033. Dr. Prevedello indicated that Cline continued to experience pain in the left V2 distribution but reported that she was far better than she had been before her surgery and she was continuing to improve. Tr. 1034. Cline

complained of a variety of other issues that had been occurring over the past month, including tingling in her hands and feet, burning and jabbing sensation in her low back, and dropping things. Tr. 1034. Dr. Prevedello recommended testing to rule out spinal cord or nerve root compression and a lumbar puncture to rule out MS. Tr. 1034.

Cline saw Dr. Baddour on April 28, 2015, and she complained of right-sided facial neuropathic pain that started earlier in April 2015. Tr. 1374. The pain was localized to the V2 and V3 distributions of the trigeminal nerve and was exacerbated by eating, cold ambient temperature, or wind blowing across her face. Tr. 1374. Prednisone helped with her facial pain but the medication was wearing off later in the day, making her pain more pronounced. Tr. 1374. Cline reported some recent gait imbalance but related it to having tried increasing her Gabapentin to help reduce her facial pain. Tr. 1374. The increased dose did not help so she was no longer increasing it. Tr. 1374. Cline reported fluctuating low back pain and chronic tingling in her hands and feet that had been present for years. Tr. 1374. Physical examination showed 5/5 motor strength in the biceps and quadriceps bilaterally, no deficits to soft touch in the hands, no deficits to pinprick over the face or occipital head region, plantar responses were downward bilaterally, deep tendon reflexes were +2 in the upper extremities, +1 at the knees, and +2 at the ankles. Tr. 1374. Dr. Baddour ordered a head MRI to assess Cline's new reports of right-sided trigeminal neuralgia. Tr. 1375.

On May 12, 2015, Cline saw Dr. Prevedello along with a resident Dr. Wenya Bi, M.D., Ph.D., for follow up. Tr. 1120-1125. Cline was unable to obtain the spinal MRI to rule out spinal cord or nerve root compression due to insurance reasons. Tr. 1124. However, she was able to have the lumbar puncture procedure performed that day. Tr. 1124. Cline explained her new onset of right-sided facial pain, which she described as similar to prior symptoms on her left

side. Tr. 1124. Physical examination findings showed grossly normal range of motion, no dependent edema in arms/legs, mood and affect were normal, sensation was intact to fine and crude touch in bilateral V1-3 distributions, extremities moved with full strength, and independent ambulation. Tr. 1124-1125. Additional testing was ordered to evaluate for evidence of MS or demyelinating disease and Cline was advised to follow up with her neurologist for possible neuropathy. Tr. 1125. The following day, Cline sought emergency room treatment at Shelby Hospital for a spinal headache which she stated had started immediately after she had the spinal tap the day before. Tr. 1348. Cline was discharged home the same day in stable condition. Tr. 1351.

On May 21, 2015, Cline saw rheumatologist Scott R. Burg, D.O., at the Cleveland Clinic for a consultation regarding her foot and back pain. Tr. 1192-1197. On physical examination, Dr. Burg observed deep tendon reflexes 2+ and symmetric in all extremities; normal sensory exam; normal 5+/5+ muscle strength; normal bulk and tone; no visible abnormalities in the cervical spine; full range of motion in the cervical spine; and no tenderness to palpation in the cervical spine; no visible abnormalities in the thoracic spine; slight tenderness in the lower parathoracic region; no visible abnormalities in the lumbar spine; full range of motion in the lumbar spine with slight lumbar spine tenderness to palpation; negative straight leg raise; adequate heel and toe walking; normal inspection of upper and lower extremities. Tr. 1194-1195. Dr. Burg noted that Cline had multiple medical problems along with complaints of chronic lower thoracic and lumbar pain in addition to burning pain in her feet. Tr. 1196. Dr. Burg encouraged Cline to discuss the burning pain with her neurologist if she had not done so already. Tr. 1197. Dr. Burg did not see evidence of an inflammatory synovitis and he could not

say whether she had fibromyalgia alone. Tr. 1197. He recommended additional testing and follow up with him in three weeks. Tr. 1197.

On May 22, 2015, Cline had a brain MRI performed as ordered by Dr. Baddour. Tr. 1345-1346. The MRI was similar to the March 2014 imaging except there was a small amount of fluid present in the left mastoid air cells non-specific in its appearance that was not present on the previous MRI. Tr. 1346.

During a May 28, 2015, visit with Dr. Baddour, Cline complained of burning and stinging pain in her feet and Dr. Baddour noted slight decreased vibration sensation in the feet. Tr. 1372, 1373. He observed 5/5 motor strength in the quadriceps and dorsiflexors bilaterally, no deficits in pinprick over the face, plantar responses were downward bilaterally, deep tendon reflexes were absent at the knees and right ankle and trace at the left ankle. Tr. 1372. Dr. Baddour ordered additional testing to assess for neuropathy and noted that EMG/nerve conduction studies of the lower extremities would be considered if her lower extremity symptoms persisted and depending on other analyses. Tr. 1373.

During a visit with Dr. Baddour on June 23, 2015, Cline complained of right occipital neuralgia pain that had been prominent over the prior five days and she was having occasional neck pain. Tr. 1371. Physical examination findings were unremarkable. Tr. 1371. Dr. Baddour prescribed Prednisone and Dilantin and ordered cervical x-rays to assess her occasional neck pain. Tr. 1371.

Cline saw Dr. Prevedello on June 29, 2015, for follow up regarding her spinal tap and other testing. Tr. 1139-1144. Cline relayed that her face pain had "improved tremendously and she [was] very satisfied with the result." Tr. 1143. Physical examination findings showed normal range of motion, no edema, normal strength and reflexes, no cranial deficit, normal

muscle tone, normal gait and normal coordination, and mood, affect and judgment were normal. Tr. 1143. Dr. Prevedello informed Cline that the results from the lumbar puncture showed no abnormality and instructed her to follow up when necessary. Tr. 1144.

On July 30, 2019, Cline had a cervical spine x-ray taken, which showed mild disc disease and facet arthropathy in the lower cervical spine and minimal osseous foraminal narrowing at C5-C6 on the right. Tr. 1338.

During an August 3, 2015, visit, Dr. Baddour noted that an MRI and other testing performed at OSU did not suggest the presence of demyelinating disease. Tr. 1370. Physical examination findings were unremarkable. Tr. 1369. Dr. Baddour noted Cline's complaints of stinging in her feet as well as her other complaints of pain. Tr. 1370. On August 14, 2015, and September 11, 2015, Dr. Baddour administered trigger point injections in Cline's right upper cervical paraspinal muscles due to Cline's reports of neck pain and right occipital neuralgia pain. Tr. 1367-1368.

Cline saw her primary care physician Dr. Secor on August 6, 2015, for cold symptoms, a lump on her back and multiple aches. Tr. 1391. Cline was interested in seeing a specialist regarding her muscle and joint aches. Tr. 1391. Dr. Secor referred Cline to a rheumatologist for assessment of polyarthritis. Tr. 1394.

Cline saw Dr. David G. Stainbrook, Jr., D.O., in August and September 2015 for her joint pain and osteoarthritis. Tr. 1158-1164, 1165-1173. During the August 27, 2015 visit, Dr. Stainbrook assessed fibromyalgia syndrome based on history, which he noted was supported by this examination that day. Tr. 1165. Dr. Stainbrook noted that Cline could benefit from a psychological evaluation and treatment of any underlying depression and/or anxiety disorder and evaluation by chronic pain management. Tr. 1165. Dr. Stainbrook prescribed Savella and

provided Cline with a referral for physical therapy. Tr. 1165. Dr. Stainbrook also assessed osteoarthritis, back pain, lumbar disc degenerative disease, lumbar spine osteoarthritis, cervicalgia, cervical disc disease, osteoarthritis of the cervical spine, arthralgia of hip, osteoarthritis of hip, arthralgia of the ankle and/or foot, osteoarthritis of ankle and foot, vitamin D deficiency, occipital neuralgia, trigeminal neuralgia, migraine headache, fatigue, overweight, and disorder of bone and cartilage, unspecified. Tr. 1165-1166, 1170-1171. Dr. Stainbrook's physical examination findings during the August 27, 2015, visit were generally normal, including a normal gait, except he noted some abnormal findings, including an obese abdomen; cervical spine tenderness and severely reduced cervical spine range of motion; thoracic spine tenderness; lumbar spine tenderness; left hip tenderness with mildly reduced range of motion; tenderness and pain in the hips with decreased range of motion; right and left TMJ positive for crepitus; MTP1 and MTP5 in the feet bilaterally positive for pain and decreased range of motion; and soft tissue discomfort noted in various areas with 18 out of 18 total tender points. Tr. 1169-1170. Bilateral foot x-rays were taken on August 27, 2015. Tr. 1188. The impression was no acute osseous abnormality, no erosive osseous changes, mild right hallux valgus deformity with bunion formation and associated right first MTP joint degenerative changes, and tiny plantar and retrocalcaneal enthesophytes bilaterally. Tr. 1188-1189.

During Cline's September 9, 2015, visit, Dr. Stainbrook diagnosed Cline with osteoarthritis, cervical degenerative disease, osteoarthritis of the cervical spine, hip and ankle and foot, lumber disc degenerative disease, vitamin D deficiency, trigeminal neuralgia, occipital neuralgia, fibromyalgia, positive ANA, calcaneal spur and arthralgia of the ankle and/or foot. Tr. 1158-1159. Physical examination findings included left knee being positive for normal crepitus, gait was normal, and there was soft tissue discomfort noted in various areas with 18 out

of 18 tender points. Tr. 1161-1162. There were no range of motion limitations noted. Tr. 1161-1162. Cline had not started Savella yet because prior authorization was required. Tr. 1159. She planned to follow up with her pharmacy that day. Tr. 1159. She was going to start physical therapy the following week. Tr. 1159.

On September 16, 2015, Cline had an initial physical therapy evaluation. Tr. 1177-1179. She rated her symptoms at a 5/10 and indicated they varied between 3/10 and 8/10. Tr. 1177. The physical therapist noted the following regarding lumbar spine testing "flexion 50%, extension and lateral flexion in either direction 25% limited." Tr. 1178. As far as the cervical spine, the therapist noted "flexion, extension and rotation in either direction 50% limited with lateral flexion 25% limited." Tr. 1178. The therapist indicated that Cline's signs and symptoms appeared consistent with "impaired joint mobility, motor function, muscle performance and range of motion associated with connective tissue dysfunction." Tr. 1179. Cline attended therapy from September 16, 2015, through November 4, 2015, for a total of 11 sessions. Tr. 1326-1336. Although she attended 11 sessions, Cline did not show for her final session so a final assessment was not performed. Tr. 1326. The therapist noted that, during the sessions, Cline continued to have good and bad days depending on her activities and stress level. Tr. 1326.

Cline saw Dr. Baddour on November 3, 2015. Tr. 1365-1366. It was noted that Cline was seeing a rheumatologist, Dr. Stainbrook, for fibromyalgia and osteoarthritis. Tr. 1365-1366. Savella and aquatic therapy had been of modest benefit. Tr. 1365. Cline reported fatigue for which she received a B12 injection. Tr. 1365. She was still having tension-vascular headaches but they had diminished in frequency. Tr. 1365-1366. Physical examination findings were unremarkable. Tr. 1365.

Upon Dr. Baddour's referral, on December 2, 2015, Cline saw Dr. Devon S. Conway, M.D., at the Cleveland Clinic for a consultation regarding the possibility of MS. Tr. 1216-1220. During the visit, Cline relayed that she was friends with another patient of Dr. Conway's and that friend had suggested that Cline see Dr. Conway about the possibility of MS. Tr. 1216. Dr. Conway found that Cline's neurological examination was unremarkable. Tr. 1220. He concluded that MS was not likely. Tr. 1220. Dr. Conway indicated that a possible alternative diagnosis might be peripheral neuropathy but he noted that Cline did not have significant sensory deficits on examination. Tr. 1220. In light of the lack of clear explanation for Cline's symptoms, Dr. Conway felt that an EMG and/or QSART[3] might be worth pursuing. Tr. 1220. Cline wanted to have the testing performing locally so Dr. Conway noted he would defer to Dr. Baddour. Tr. 1220.

On January 7, 2016, Dr. Baddour administered another B12 injection to help Cline with her fatigue. Tr. 1364. Cline saw Dr. Baddour on February 3, 2016. Tr. 1362-1363. Cline relayed that she had a recent fall. Tr. 1363. She reported stinging pain in her feet and occasional weakness and occipital pain in her hands. Tr. 1363. Dr. Baddour indicated that an EMG/nerve conduction study would be ordered to assess for possibly polyneuropathy. Tr. 1363. Dr. Baddour's physical examination findings were generally unremarkable. Tr. 1362. On physical examination, Dr. Baddour observed decreased vibration in the feet and deep tendon reflexes were absent in the knees. Tr. 1362.

On March 27, 2016, Cline presented to the Shelby Hospital emergency room with complaints of left-sided cheek/facial spasms. Tr. 1271. Physical examination findings were

---

[3] "QSART is a test that measures the autonomic nerves that control sweating. The test is useful in assessing autonomic nervous system disorders, peripheral neuropathies, and some types of pain disorders." https://my.clevelandclinic.org/health/diagnostics/16398-quantitative-sudomotor-axon-reflex-test-qsart (last visited 7/31/2019).

unremarkable.  Tr. 1274.  Her diagnosis on discharge was chronic pain in face.  Tr. 1275.  She was discharged home in stable condition with prescriptions of Prednisone and Oxycodone with acetaminophen.  Tr. 1279.   The next day, Cline followed up with Dr. Baddour.  Tr. 1361.  Cline relayed that she was experiencing an exacerbation of severe trigeminal neuralgia pain in the left V2 and V3 distributions that started five days prior.  Tr. 1361.  Dr. Baddour noted that, following Cline's visit to the emergency the day before, she was started on Prednisone and given narcotics.  Tr. 1361.  Cline reported that her pain was slightly reduced but still severe.  Tr. 1361.  She described her pain as burning, sharp, and intermittent.  Tr. 1361.  Physical examination findings were unremarkable.  Tr. 1361.

On April 9, 2016, Cline returned to the emergency room at Shelby Hospital.  Tr. 1258-1269.  Cline complained of sharp pain to the right side of her face and ear.  Tr. 1258.  She relayed that she had called her neurologist the day before and had her Dilantin increased.  Tr. 1258.  Physical examination notes indicate that Cline was not in acute distress.  Tr. 1260.  She was treated in the emergency room with Dilaudid and Phenergan and discharged home in stable condition.  Tr. 1262, 1267.

Cline returned to see Dr. Prevedello on April 19, 2016.  Tr. 1416-1424.  Physical examination findings showed normal range of motion, no edema, normal strength and normal reflexes, no cranial nerve deficit, normal muscle tone, normal gait and coordination, normal mood, affect and judgment, and she was neurologically intact.  Tr. 1421.  Dr. Prevedello indicated that a recent brain FIESTA sequence MRI did not reveal any specific abnormality.  Tr. 1414, 1420, 1421.  Dr. Prevedello discussed with Cline the possibility of redoing the microvascular decompression procedure or consulting with Dr. John McGregor regarding other possible treatments, e.g., glycerol balloon, radiofrequency, gamma knife.  Tr. 1422.

Cline saw Dr. Baddour on May 5, 2016. Tr. 1358-1359. Physical examination showed motor strength 5/5 in the hands bilaterally and there were no deficits to soft touch in the hands. Tr. 1359. Cline had not had any severe tension-migraine type headaches recently. Tr. 1359. Cline's facial pain had diminished. Tr. 1359. Dr. Baddour administered a B12 injection for her fatigue. Tr. 1359.

On July 7, 2016, Cline underwent a diagnostic assessment at Family Life Counseling and Psychiatric Services. Tr. 1481-1489. Cline was seeking support with parenting. Tr. 1482. Individual and/or family counseling was recommended to decrease symptoms of anxiety and stress and increase coping skills. Tr. 1489. She attended a few counseling sessions through November 2016. Tr. 1490-1498.

On August 10, 2016, Cline saw Dr. John McGregor, M.D., at OSU in the neurological surgery department. Tr. 1422. Cline discussed her recent flare ups of her facial pain. Tr. 1423. She explained that the significant pain she experienced during the flare ups had subsided and she was comfortable and pain free now but was concerned about the potential for recurrence. Tr. 1423. Dr. McGregor discussed management of her pain with medications for now and also reviewed possible alternative treatments, including surgical intervention should the medications no longer maintain reasonable control of her pain and/or if the side effects of medications became too significant due to having to increase the dosage. Tr. 1423.

On August 11 and 12, 2016, Cline had EMG/nerve conduction tests performed on her upper and lower extremities. Tr. 1427-1431, 1504. The upper extremity testing showed mild carpal tunnel on the right. Tr. 1427, 1504. Otherwise, the upper extremity testing was normal. Tr. 1427, 1504. The lower extremity testing was normal. Tr. 1430, 1504.

Cline saw Dr. Baddour on August 26, 2016. Tr. 1504-1505. Dr. Baddour noted Cline's pain had overall diminished on her current therapy but her pain continued to fluctuate in severity. Tr. 1505. Dr. Baddour noted the recent EMG results and ordered a splint for Cline's right wrist. Tr. 1505. Cline was not interested in surgery for her wrist. Tr. 1505. She continued to report neck pain and mild lower cervical degenerative joint disease. Tr. 1505. Cline's tension-migraine headaches had subsided. Tr. 1505. Physical examination findings were unremarkable. Tr. 1505.

Cline saw Dr. Baddour on November 1, 2016, for a follow-up visit. Tr. 1502-1503. Cline reported chronic tingling in her hands and feet that had been present for years but was now prominent in her right hand. Tr. 1502. She also relayed that over the prior three days she had prominent right suprascapular pain and tenderness and pain radiating to her right shoulder and right hand. Tr. 1502. Dr. Baddour's physical examination findings showed 5/5 motor strength in the right deltoid, triceps, biceps and hand; no deficits to soft touch in the right hand; plantar responses were downward bilaterally; deep tendon reflexes were +2 in the right upper extremity and trace to +1 in the left upper extremity; she was able to elevate her right arm fully; Tinel sign was absent at the right wrists and right elbow; right radial pulse was +2; and there was tenderness noted over the right supraspinatus muscle. Tr. 1503. Cline relayed she was not interested in pursuing gamma knife treatment for her trigeminal neuralgia pain. Tr. 1503. Dr. Baddour suspected that Cline's right suprascapular pain was due to fibromyalgia or musculoskeletal strain. Tr. 1503. Dr. Baddour prescribed a cream and medication for the newly reported pain and continued other medications. Tr. 1503.

Cline saw Dr. Baddour again on February 1, 2017. Tr. 1500-1501. Cline reported a recent flare-up in the left distribution trigeminal nerve V2 distribution pain following a tooth

filling.  Tr. 1500.  Physical examination findings were unremarkable.  Tr. 1501.  Dr. Baddour continued Cline on her medications.  Tr. 1501.

On May 3, 2017, Cline resumed counseling at Family Life Counseling.  Tr. 1507.  Her therapist noted that Cline did not have much change in her presenting problems.  Tr. 1507.  Cline relayed that she had a full plate – "taking care of her adult children and her seven year old son."  Tr. 1507.  Cline also relayed that she had a number of medical problems for which she was receiving medical treatment.  Tr. 1507.  Her middle son was living with her during the week but staying at his own apartment on the weekends, which was a change from their prior living situation.  Tr. 1507.  Cline indicated she was interested in volunteering at Richland Outreach and Big Brothers/Big Sisters.  Tr. 1507.  Cline's therapist diagnosed adjustment disorder with anxiety and recommended outpatient care, including counseling to assist with reducing life stressors and increasing healthy coping skills.  Tr. 1507.

Cline saw Dr. Baddour again on May 18, 2017.  Tr. 1509-1510.  Dr. Baddour noted that Cline's fatigue, muscle pain, and tenderness limited her activities and she reported some unsteadiness of gait.  Tr. 1509.  Cline was no longer seeing a rheumatologist for fibromyalgia and osteoarthritis.  Tr. 1509.  Physical examination showed some abnormal findings – slight decreased vibration in the right foot; tenderness over the calves, right forearm, upper arms bilaterally, and thighs bilaterally; and tenderness over the upper and lower back bilaterally.  Tr. 1509.  Dr. Baddour noted that he completed a form during the visit regarding Cline's functional capacity and activity limitations.  Tr. 1510.

### 2.  Opinion evidence

#### a.  Treating sources

##### *Dr. Ness*

On June 30, 2015, Dr. Ness opined that Cline's impairments caused an inability to concentrate/focus and she was distracted by pain and a fear of sudden pain.  Tr. 1151.

### *Dr. Baddour*

On May 18, 2017, Dr. Baddour completed a Physical RFC Questionnaire.  Tr. 1511-1515.  Dr. Baddour listed Cline's diagnoses, which included bilateral trigeminal neuralgia, right occipital neuralgia, fibromyalgia, osteoarthritis, headaches, restless leg syndrome, and right carpal tunnel.  Tr. 1511.  Dr. Baddour indicated that Cline's symptoms included headache, facial pain, hand pain, dizziness, neck and back pain, unsteady gait, and musculoskeletal pain.  Tr. 1511.  Dr. Baddour described Cline's pain as chronic and often severe, noting that some of her pain was neuropathic (burning, stinging).  Tr. 1511.  When asked to identify clinical findings and objective signs, Dr. Baddour stated "see physical exams in notes."  Tr. 1511.  Dr. Baddour indicated that Cline's course of treatment included prescription medications, nerve blocks and surgery for trigeminal nerve decompression.  Tr. 1151.  Dr. Baddour opined that emotional factors contributed to Cline's symptoms and functional limitations and he noted that the following psychological conditions affected her physical condition – depression and anxiety.  Tr. 1512.  Dr. Baddour opined that Cline's pain or symptoms were severe enough to frequently interfere with attention and concentration needed to perform even simple work tasks.  Tr. 1512.  Dr. Baddour opined that Cline would be capable of low stress jobs, noting that higher stress caused exacerbations of pain.  Tr. 1512.

Dr. Baddour opined that Cline could sit at one time for 1 hour; stand at one time for 1 hour; sit for a total of 2-4 hours in an 8-hour workday; stand/walk for less than 2 hours in an 8-hour workday; would need to walk for 5 minutes every 60-120 minutes; would need a job that allowed her to shift positions at will from sitting, standing or walking; would need to take

unscheduled breaks every 2 hours during an 8-hour workday for 5 minutes; could occasionally lift and carry 10 pounds, rarely lift and carry 20 pounds, and never lift and carry 50 pounds; could occasionally look down (sustained flexion of neck), rarely turn head to the right or left; rarely look up, and frequently hold her head in a static position; could occasionally twist, stoop, and crouch/squat, rarely climb stairs, and never climb ladders; would be limited to using her right hand 50% of the time during an 8-hour workday for grasping, turning and twisting objects, limited to using her fingers 50% of the time during an 8-hour workday for fine manipulation on the right, and limited to using her right and left arms 50% of the time during an 8-hour workday for reaching; would have good and bad days; and would likely be absent more than 4 days per month. Tr. 1512-1514. Dr. Baddour indicated that Cline's pain was worsened by cold temperatures and that increased humidity, noise, bright lights, and fumes could trigger migraine headaches. Tr. 1514. Dr. Baddour opined that Cline's symptoms and limitations had been present since 2015. Tr. 1515.

### b. Consultative examining psychologist

On June 30, 2015, consultative psychologist James P. Sunbury, Ph.D., ABPP, examined Cline. Tr. 1530-1534. Dr. Sunbury diagnosed Cline with unspecified depressive disorder. Tr. 1533. Dr. Sunbury noted that Cline walked cautiously and stood up once during the interview, stating "[m]y back's killing me." Tr. 1531. Cline relayed crying often and then feeling okay for awhile. Tr. 1532. Dr. Sunbury noted that Cline did cry during the interview and Cline explained that she has been to the point of suicide when her pain had been at its worst (but she never attempted to harm herself). Tr. 1532. Cline demonstrated good attention during the interview but Cline explained that her mental functional abilities were limited by her many physical problems and her pain was distracting. Tr. 1533. Dr. Sunbury found that Cline's health issues

were the main cause of her depression and he felt that she could benefit from treatment for depression.  Tr. 1534.

### c. **Reviewing physicians/psychologists**

*Physical*

On June 13, 2015, state agency reviewing physician Gerald Klyop, M.D., completed a physical RFC assessment.  Tr. 80-81.  Dr. Klyop opined that Cline had the RFC to occasionally lift/carry 20 pounds; frequently lift/carry 10 pounds; stand and/or walk 6 hours in an 8-hour workday; sit about 6 hours in an 8-hour workday and push and/or pull unlimitedly, other than as indicated for lift/carry.  Tr. 80.  Dr. Klyop found no postural, manipulative, visual, communicative, or environmental limitations.  Tr. 80.  In explaining his RFC, Dr. Klyop noted that Cline had normal neurological examinations, 5/5 motor strength, and normal range of motion.  Tr. 81.

Upon reconsideration, on November 2, 2015, state agency reviewing physician Theresa March, D.O., completed a physical RFC assessment.  Tr. 112-114.  Dr. March reached the same conclusions regarding Cline's exertional limitations and agreed that there were no postural, manipulative, visual, or communicative limitations.  Tr. 112-113.  However, with respect to environmental limitations, Dr. March concluded that Cline would need to avoid unprotected heights and heavy machinery due to an elevated BMI.  Tr. 113-114.

*Mental*

On August 19, 2015, state agency reviewing psychologist Aracelis Rivera, Psy.D., completed a Psychiatric Review Technique ("PRT") (Tr. 78) and Mental RFC Assessment (Tr. 81-83).  In the PRT, Dr. Rivera found mild restrictions in activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining

concentration, persistence or pace. Tr. 78. There were no repeated episodes of decompensation, each of an extended duration. Tr. 78. In the Mental RFC, Dr. Rivera concluded that Cline would be capable of concentrating and persisting for short periods of time; she would perform best at a job with 2-3 step tasks that were simple in nature; would perform best at a job that required little to no contact with the general public and that did not require direct over the shoulder supervision; she would have difficulty working in an environment with frequent changes and would perform best at a job where tasks were static and routine. Tr. 81-82.

Upon reconsideration, on October 15, 2015, state agency reviewing psychologist Cynthia Waggoner, Psy.D., completed a Psychiatric Review Technique ("PRT") (Tr. 110-111) and Mental RFC Assessment (Tr. 114-116). Dr. Waggoner reached the same conclusions as Dr. Rivera.

## C.      Testimonial evidence

### 1.      Plaintiff's testimony

Cline was represented and testified at the hearing. Tr. 38-39, 40-59. Cline indicated she stopped working because she was having significant pain in her face. Tr. 43. Following a number of emergency room visits and x-rays, she was told she had TMJ and that she should see Dr. Ness, a specialist in Columbus. Tr. 43. Cline indicated that her pain level was a 10 plus. Tr. 43. When she consulted with Dr. Ness, she was told she had trigeminal neuralgia. Tr. 43. Dr. Ness indicated that Cline should see a neurologist. Tr. 44. Since Cline was already seeing a neurologist, Dr. Baddour, she immediately followed up with him. Tr. 44. Dr. Baddour prescribed Tegretol, which provided Cline some relief but then she broke out in a rash and it was determined she was allergic to the medication. Tr. 44. A number of different medications were tried without success. Tr. 44-45. Cline started to look into other treatment options and, in

January 2015, Dr. Prevedello performed a surgical procedure called microvascular decompression which involved separating Cline's nerve from the artery that was causing her electric shock pain. Tr. 45. Dr. Prevedello explained that the surgery might not completely eliminate all her pain or the pain could return. Tr. 45. Following her surgery, Cline still takes medication and continues to see Dr. Baddour. Tr. 45.

Cline's facial pain comes and goes. Tr. 48. She explained that, if she is out and the wind is blowing, it can cause facial pain. Tr. 48. She also has facial pain when brushing her teeth or with temperature extremes. Tr. 48. Following her surgery in January 2015, Cline had a reduction in the amount of pain she was experiencing. Tr. 48. However, in March of 2016, Cline had a bad flare-up. Tr. 48. She was seen at the emergency room twice in one week. Tr. 48. Cline explained that the pain felt like an electric shock to her face. Tr. 49. During her second visit to the emergency room, Cline received a shot of Dilaudid. Tr. 49. Following her flare-up, Cline saw Dr. Prevedello to see what else could be done. Tr. 49. He advised her that they could try to redo her surgery but he could not promise that her pain would be any better than it was and the surgery would be a difficult surgery. Tr. 50. Cline also consulted with Dr. Ness regarding a different type of procedure that she believed involved radioactive frequency. Tr. 50. She noted that the procedure she discussed with Dr. Ness might be an option but she was not sure at that time. Tr. 50.

Prior to her diagnosis of trigeminal neuralgia, Cline had seen Dr. Baddour and had been complaining of sharp, radiating pain on the right side of her head. Tr. 46. Dr. Baddour felt that it was a nerve causing the pain. Tr. 46. Dr. Baddour treated that pain with injections in Cline's head and trigger point injections in the right side of her neck. Tr. 46. Dr. Baddour also administered injections to treat Cline's neck pain. Tr. 41.

Cline explained that she also has tingling in her hands and arm; carpal tunnel in her right arm; a lot of burning and jabbing pain in her lower back and feet; neuropathy, explaining she has pins and needles that felt like hot coals in her feet; and tiredness. Tr. 46. Cline indicated that she was just not able to do what she used to be able to do. Tr. 46. Dr. Baddour had ordered a wrist splint for Cline back in August of 2016 but Cline had misplaced it. Tr. 46, 56. Because of the problems with her carpal tunnel, Cline is limited in what she can handle, grasp and carry. Tr. 56. Although Cline was not sure that the splint helped a lot, she had inquired about getting another one. Tr. 46. She takes a lot of medication and stated she really should not be driving and therefore limits her driving to very short distances and only when she has to. Tr. 46. Cline estimated driving once or twice each week. Tr. 41. When she is driving, Cline has forgotten where she is going and she has also fallen asleep behind the wheel. Tr. 55.

The ALJ asked Cline to describe where she experienced pain related to her diagnosis of fibromyalgia. Tr. 50. Cline explained the pain was in her feet, back and hands with tenderness all over her body. Tr. 50. She indicated that she can be sitting and all of a sudden she has sharp pain. Tr. 50. She was taking Savella and Neurontin for her fibromyalgia. Tr. 50-51. Cline also has restless leg syndrome and takes another medication for that. Tr. 50-51.

Cline explained that she has multiple side-effects from all the different medications that she takes, including very bad forgetfulness, dry mouth, withdrawal symptoms, stomach sickness, feeling very hot, and headaches. Tr. 52-53. Cline has problems with her balance. Tr. 53. For example, she will run into the wall and she has fallen down before. Tr. 53. Cline has crying spells which she believes are a side-effect from her medication. Tr. 58-59. Cline is depressed – she avoids going places or being around people. Tr. 59.

Cline has headaches on a daily basis and the lowest pain level she has is a five or six, indicating that is a good day. Tr. 53-54. Cline had a headache at the hearing. Tr. 54. Medication helps with her headaches but they can last three or four days. Tr. 54. She has also had injections to help with her headaches. Tr. 54. Cline noted that she had brain surgery in 1994 to drain a retinoid cyst. Tr. 55. She was hopeful that that surgery would help with her headaches but, after she started having really bad headaches, Dr. Baddour ordered an MRI and it was determined that the cyst had returned. Tr. 54-55.

As far as activities of daily living, in addition to her limited driving, Cline tries to cook – she uses the crock pot and microwave because she cannot stand. Tr. 47. Cline tries to do dishes every day or have her son get them done every day. Tr. 47. When Cline is standing and doing dishes, she notices that she gets a lot of pain in her feet, hands, and back and looking down towards the sink causes her pain in the back of her head and neck. Tr. 47. Looking up or turning her head also causes Cline pain that radiates into her back and neck. Tr. 58. She has learned to turn her whole body, not just her head because of the radiating pain it causes. Tr. 58. Cline does not do a lot of reading because she has eye pain from her trigeminal neuralgia. Tr. 47. She occasionally reads on her tablet or looks things up on the internet. Tr. 47. Cline's sons help do the laundry. Tr. 57. She will sit and fold the clothes. Tr. 57. Sometimes folding clothes will aggravate her pain and sometimes it does not. Tr. 57. Cline can go grocery shopping at smaller retail stores but usually her sons or her mother go with her. Tr. 57. Cline very rarely carries in groceries. Tr. 57. Her sons are usually home to help her. Tr. 57-58.

## 2.    Vocational expert's testimony

The Vocational Expert Lanell Hall ("VE") testified at the hearing. Tr. 60-67. The VE classified Cline's past work as home attendant, a medium semi-skilled job, performed at the very heavy exertion level. Tr. 60.

For his first hypothetical, the ALJ asked the VE to assume an individual Cline's age and with the same education and past work experience who can work at a light exertional level; cannot be exposed to workplace hazards such as unprotected heights or moving mechanical parts; is limited to no more than moderate noise level typical of what would be found in an office environment; must work in a static and routine office environment in which changes are infrequent and there can be no strict production requirements. Tr. 60. The VE indicated that the described individual could not perform Cline's past work but there were light, SVP 2[4] jobs that the described individual could perform, including housekeeping cleaner; cashier II, and mail clerk. Tr. 61. National job incidence data was provided for each of the identified jobs. Tr. 61.

For his second hypothetical, the ALJ asked the VE to consider the first hypothetical but the individual would be limited to frequent handling and fingering with the right hand. Tr. 61. The VE indicated that the three jobs previously identified could be performed. Tr. 61.

For his third hypothetical, the ALJ asked the VE to consider the first hypothetical but the individual would be limited to occasional handling and fingering with the right hand. Tr. 62. With that limitation added, the VE indicated that the jobs of housekeeping cleaner, cashier II,

---

[4] SVP refers to the DOT's listing of a specific vocational preparation (SVP) time for each described occupation. Social Security Ruling No. 00-4p, 2000 WL 1898704, *3 (Dec. 4, 2000). "Using the skill level definitions in 20 CFR 404.1568 and 416.968, unskilled work corresponds to an SVP of 1-2; semi-skilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9 in the DOT." *Id.*

and mail clerk could not be performed and there would be no other work at the light level.  Tr. 62-63.

For his fourth hypothetical, the ALJ asked the VE to assume the same limitations as contained in the first or second hypothetical but the individual would be absent from work two days per month.  Tr. 63.  The VE indicated that, with that additional limitation, there would be no work available.  Tr. 63.  The VE noted that anything more than one day per month or more than eight times per year would be work preclusive.  Tr. 63.

For his fifth hypothetical, the ALJ asked the VE to assume the same limitations as contained in the first or second hypothetical but the individual would be off task more than 10 percent of the time in an eight-hour workday due to pain.  Tr. 63.  The VE indicated that the additional off-task limitation would be work preclusive.  Tr. 63-64.

Cline's counsel asked the VE to consider the first or second hypothetical with the additional limitation of needing to change positions at will from sitting to standing or allowing for a sit/stand option, with the individual being able to sit or stand for no more than an hour at a time.  Tr. 64.  The VE indicated that the at will sit/stand option would eliminate the light jobs previously identified.  Tr. 65.  In response to follow-up questioning by the ALJ, the VE noted that an at will sit/stand option would be work preclusive even at the sedentary level.  Tr. 65.

Cline's counsel then asked the VE to consider a hypothetical individual who would be limited to lifting 10 pounds occasionally; standing for two hours in an eight-hour workday; sitting for four hours in an eight-hour workday; occasionally being able to twist, stoop, and crouch; rarely able to climb stairs; and never able to climb ladders.  Tr. 65-66.  The VE indicated that the described individual would be unable to perform Cline's past work and there would be

no other work available for the described individual because of the inability to sit, stand or walk for a combination of at least eight hours per day. Tr. 66.

Cline's counsel then asked the VE to consider again the first or second hypothetical but that the individual would be rarely (less than five percent of the day) able to look upwards and look from left to right and keep her head in a static position for the majority of the day. Tr. 66. Cline's counsel asked whether that additional limitation would preclude the previously identified jobs of cleaner, cashier II, and mail clerk. Tr. 66-67. The VE indicated that those jobs could not be performed with the additional limitations noted. Tr. 67.

For his last question, Cline's counsel asked the VE to consider the first or second hypothetical but with an additional limitation that the individual could have no contact with the general public but would not require direct over-the-shoulder supervision. Tr. 67. The VE indicated that the additional limitation would affect the cashier II position but the cleaner and mail clerk positions would remain available. Tr. 67.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[5] . . . .

---

[5] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 423(d)(2)(A).

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1. If claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment,[6] claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[7] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the

---

[6] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.  20 C.F.R. § 404.1525.

[7] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors to perform work available in the national economy. *Id.*

## IV. The ALJ's Decision

In his December 4, 2017, decision the ALJ made the following findings:[8]

1.  Cline meets the insured status requirements of the Social Security Act through December 31, 2018. Tr. 17.

2.  Cline has not engaged in substantial gainful activity since November 21, 2014, the alleged onset date. Tr. 17.

3.  Cline has the following severe impairments: fibromyalgia, trigeminal neuralgia, headaches, occipital neuralgia, and depressive disorder. Tr. 18-21. Carpal tunnel syndrome, cervical disc disease, esophageal ulcer, brain cyst, and obesity were not severe. Tr. 21.

4.  Cline does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments. Tr. 21-22.

5.  Cline has the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b) except: no work at unprotected height or around moving mechanical parts, and no more than moderate noise level, typical of what would be found in an office environment. Additionally, Cline is limited to a static and routine work environment in which changes are infrequent and there are no strict production requirements. Tr. 23-26.

6.  Cline is unable to perform any past relevant work. Tr. 26.

7.  Cline was born in 1971 and was 43 years old, defined as a younger individual age 18-49, on the alleged disability onset date. Tr. 26.

8.  Cline has at least a high school education and is able to communicate in English. Tr. 26.

9.  Transferability of job skills is not material to the determination of disability. Tr. 26.

10. Considering Cline's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Cline can perform, including cleaner, cashier II, and mail clerk. Tr. 26-27.

---

[8] The ALJ's findings are summarized.

Based on the foregoing, the ALJ determined Cline had not been under a disability, as defined in the Social Security Act, from November 21, 2014, through the date of the decision. Tr. 28.

## V. Plaintiff's Arguments

Cline argues that the ALJ erred by assigning reduced weight to the opinion of her treating neurologist Dr. Baddour. Doc. 15, pp. 16-20. Cline also argues that the ALJ failed to properly evaluate her pain. Doc. 15, pp. 20-23.

## VI. Law & Analysis

### A.    Standard of review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. 42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). Accordingly, a court "may not try the

case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

## B. Reversal and remand is warranted

Cline argues that the ALJ erred by assigning reduced weight to the opinion of her treating neurologist Dr. Baddour. Doc. 15, pp. 16-20.

Under the treating physician rule, "[t]reating source opinions must be given 'controlling weight' if two conditions are met: (1) the opinion 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the] case record.'" *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (citing 20 C.F.R. § 404.1527(c)(2)); *see also Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

If an ALJ decides to give a treating source's opinion less than controlling weight, he must give "good reasons" for the weight he assigns to the opinion. *Gayheart*, 710 F.3d at 376; *Wilson*, 378 F.3d at 544; *Cole v. Comm'r of Soc. Sec.*, 661 F.3d 931, 937 (6th Cir. 2011). In deciding the weight to be given, the ALJ must consider factors such as (1) the length of the treatment relationship and the frequency of the examination, (2) the nature and extent of the treatment relationship, (3) the supportability of the opinion, (4) the consistency of the opinion with the record as a whole, (5) the specialization of the source, and (6) any other factors that tend to support or contradict the opinion. *Bowen v. Comm'r of Soc Sec.*, 478 F.3d 742, 747 (6th Cir. 2007); 20 C.F.R. § 404.1527(c).

An ALJ is not obliged to provide "an exhaustive factor-by-factor analysis" of the factors considered when weighing medical opinions. *See Francis v. Comm'r of Soc. Sec.*, 414 Fed. Appx. 802, 804 (6th Cir. 2011). However, the "good reasons must be supported by the evidence

in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Cole*, 661 F.3d at 937 (quoting Soc. Sec. Rul. No. 96-2p, 1996 SSR LEXIS 9, at *12 (Soc. Sec. Admin. July 2, 1996)) (internal quotations omitted). "This requirement is not simply a formality; it is to safeguard the claimant's procedural rights [and] [i]t is intended 'to let claimants understand the disposition of their cases, particularly in situations where a claimant knows that his physician has deemed him disabled and therefore might be especially bewildered when told by an administrative bureaucracy that he is not.'" *Id.* at 937-938 (citing *Wilson*, 378 F.3d at 544). Moreover, "the requirement safeguards a reviewing court's time, as it 'permits meaningful' and efficient 'review of the ALJ's application of the treating physician rule.'" *Id.* at 938 (citing *Wilson*, 378 F.3d at 544-545).

The ALJ discussed the opinion rendered by Dr. Baddour, stating:

> [T]he undersigned gives little weight to the opinion of Dr. Baddour (Exhibit 34F). Dr. Baddour's opinions that the claimant could sit/stand/walk for only 6 hours, along with other extreme limitations, such as more than four absences per month, are not consistent with his progress notes. He has been treating the claimant since 2007, which was before the onset of neuralgia. His physical exams in his progress notes (see 5/18/17 at 33F, for example) are not remarkable. For instance, he says that "she reports some unsteadiness in gait," but Dr. Baddour does not mention that he observes unsteadiness in gait, and motor strength is 5/5. The other evidence in the record shows no limitation of motion or abnormal gait.

Tr. 24.

While the ALJ provided reasons for assigning little weight to Dr. Baddour's opinion, the Court finds that reversal and remand is warranted. In assigning weight to Dr. Baddour's opinion and assessing Cline's RFC, the ALJ either overlooked, inaccurately read, and/or made misstatements regarding certain medical evidence. As noted, the ALJ assigned little weight to Dr. Baddour's opinion, stating that "The other evidence in the record shows no limitation of

motion . . ." Tr. 24. Also, in explaining the reasons why his RFC was supported by substantial evidence, the ALJ states "evidence reveals that physical examinations do not show any weakness, limitation of motion, unstable gait, or neurological deficits." Tr. 23. These statements, however, are not wholly accurate.

For example, Dr. Stainbrook, who treated Cline for fibromyalgia, on physical examination observed severely reduced cervical range of motion limitation as well tenderness in the thoracic and lumbar spines, tenderness in the hips, and mildly reduced range of motion in the hips. Tr. 1170. Dr. Stainbrook also found joint abnormalities, e.g., crepitus and decreased range of motion in knee and hip joints. Tr. 1170. Notwithstanding these physical examination findings, the ALJ states there was <u>no</u> evidence in the record of limitation of motion. Furthermore, when discussing Dr. Stainbrook's medical findings, the ALJ states there were no joint abnormalities. Tr. 19. However, as noted, Dr. Stainbrook noted various joint abnormalities. Tr. 1170. Further, the ALJ made no mention of Dr. Stainbrook's reduced range of motion findings. Tr. 19.

Additionally, when Cline was evaluated for physical therapy upon Dr. Stainbrook's referral, that evaluation noted some reduced strength in the upper and lower extremities as well as limitations in lumbar and cervical flexion and extension. Tr. 1178; *see also* Tr. 1179 (assessment reflecting current limitations or problems included increased pain, decreased mobility, decreased strength, and decreased endurance). However, the ALJ did not discuss the physical therapy evaluation. While an ALJ is not required to cite to every piece of evidence, since the records appear to be inconsistent with the ALJ's findings that there was <u>no</u> evidence of limitation of motion and/or that the evidence does not show <u>any</u> weakness or limitation of

motion, the Court is unable to assess whether the decision is supported by substantial evidence in the absence of a more thorough analysis of the evidence.

Considering that the ALJ either overlooked, inaccurately read, and/or made misstatements regarding certain medical evidence, the Court is unable to conduct a meaningful review of the decision to assess whether the decision to assign little weight to Dr. Baddour's opinion and/or the RFC assessment are supported by substantial evidence. Accordingly, the Court finds that reversal and remand is warranted for further analysis of the evidence and explanation of the weight assigned to the opinion of Cline's long-time treating neurologist. While Cline ultimately may not prevail in her request for disability benefits, in this instance, the lack of a more complete analysis of the evidence of record requires reversal and remand.

## C.     Other issue – failure to properly evaluate pain

Cline also argues that the ALJ failed to properly evaluate her pain. Doc. 15, pp. 20-23. The Court declines to address the merits of Cline's second argument because, on remand, the ALJ's further evaluation of the evidence may have an impact on his findings with respect to her credibility, *see e.g., Trent v. Astrue*, 2011 WL 841538, *7 (N.D. Ohio Mar. 8, 2011) (declining to address the plaintiff's remaining assertion of error because remand was already required and, on remand, the ALJ's application of the treating physician rule might impact his findings under the sequential disability evaluation).

## VII. Conclusion

For the reasons set forth herein, the Court REVERSES and REMANDS the Commissioner's decision for further proceedings consistent with this opinion.


Dated: July 31, 2019                              */s/ Kathleen B. Burke*
                                                  Kathleen B. Burke
                                                  United States Magistrate Judge